**Opinion filed October 9, 2014**



In The

# Eleventh Court of Appeals

_____

## No. 11-12-00293-CR

_____

## BLAS HERNANDEZ, JR., Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 40th District Court**
**Ellis County, Texas**
**Trial Court Cause No. 36567CR**

## M E M O R A N D U M   O P I N I O N

The jury convicted Blas Hernandez, Jr. of driving while intoxicated, third or more offense.[1] The jury assessed his punishment at confinement for life. The trial court ordered the life sentence in this case to run consecutively to the life sentence that Appellant was on parole for at the time of trial. Appellant asserts, in three points of error on appeal, that the trial court erred when it excused a juror, denied

---

[1]*See* TEX. PENAL CODE ANN. §§ 49.04, 49.09 (West Supp. 2014).

his motion to suppress evidence, and sentenced him to serve consecutive sentences. We affirm.

## I. *Evidence at Trial*

Kathleen Hoggatt testified that, around 4:00 a.m. on November 1, 2011, she was asleep in her home in Waxahachie, when she was awakened by a loud noise. Hoggatt went to the window and saw that someone driving a red pickup had crashed into her vehicle and was leaving the scene. After she called the police, Hoggatt went outside and found a case of beer in the front yard. Hoggatt also saw that her mailbox had been turned over, and she noticed that the impact of the crash had moved both her vehicle and her husband's vehicle.

Chris Eadler, an officer with the Waxahachie Police Department, testified that he was dispatched to the hit-and-run accident at Hoggatt's home on November 1, 2011. After Officer Eadler arrived at the scene, he noticed that Hoggatt's vehicle was badly damaged and that her husband's vehicle had been struck so hard that it had been pushed into the yard. Officer Eadler also observed that a brick mailbox had been knocked off its pedestal.

Officer Eadler immediately began searching for the hit-and-run driver in the area surrounding Hoggatt's home. Because Hoggatt reported that the driver left the scene traveling north, Officer Eadler searched for a vehicle with damage to its front and left side. Officer Eadler quickly encountered a red pickup with a broken headlight and a crushed front bumper. The bumper was pushed so hard into the pickup's front left tire that smoke was coming from the tire.

Officer Eadler caught up to the pickup, activated his overhead lights, and called for assistance. The pickup came to a stop, and Officer Eadler asked the driver to step out of his vehicle. Officer Eadler then identified the driver as Appellant and placed him under arrest. As Officer Eadler handcuffed Appellant, Officer Eadler noticed that Appellant's breath had a strong odor of alcohol, that his

2

eyes were bloodshot, that his speech was slurred, and that he had an unsteady balance.

Ron Turbeville, a sergeant with the Waxahachie Police Department, testified that he responded to Officer Eadler's call for assistance on November 1, 2011. Sergeant Turbeville stated that he recognized Appellant when he arrived at the scene and that, at that time, he was aware of Appellant's two previous driving while intoxicated (DWI) convictions. Based on Appellant's previous convictions, Sergeant Turbeville asked another officer to transport Appellant to the hospital for a mandatory blood draw.

Sergeant Turbeville took pictures of Appellant's pickup, and he noted that its condition indicated that it had recently been in a collision with another vehicle. The pickup's front left side was crumpled, and its left headlight was broken. The pickup's bumper was crushed into its left front tire, and it had a distinct smell of burning rubber. Sergeant Turbeville also noted that he found a partially consumed twelve-pack of beer inside the pickup.

Abe Partington, an officer with the Waxahachie Police Department, testified that he assisted Officer Eadler with Appellant's arrest. Officer Partington noticed that Appellant's breath had a strong odor of alcohol, that his eyes were bloodshot, and that his speech was slurred. Officer Partington was aware of Appellant's two previous DWI convictions, and based on those convictions, Officer Partington realized that a mandatory blood draw was required in this case. Officer Partington then transported Appellant to Baylor Medical Center. The camera in Officer Partington's patrol car recorded Appellant while he was inside the vehicle. On the recording, Appellant's speech is clearly slurred, and he admitted that he had consumed five beers.

After Officer Partington arrived at Baylor Medical Center, Appellant submitted to field sobriety tests in the hospital's parking lot. During the horizontal

gaze nystagmus test, Appellant displayed the maximum number of intoxication clues. Appellant also underwent the walk-and-turn test and the one-leg stand test. At the conclusion of the tests, Officer Partington determined that Appellant was "very intoxicated."

Officer Partington could not recall if Appellant agreed to or refused to provide a breath sample. On the police dash-cam video, Appellant initially appears to consent to a breathalyzer test, but later in the video, Appellant refuses to consent to take a breathalyzer test or consent to provide a blood sample. Officer Partington advised Appellant of the statutory warnings related to a refusal to provide samples and filled out form TLE-51.[2] The forms do not reflect that Appellant voluntarily provided a sample of his blood.

Ryan Smith, a phlebotomist at Baylor Medical Center, testified that she drew a sample of Appellant's blood on November 1, 2011. Smith noted that she signed the affidavit the police gave her at that time. Although the affidavit includes a section for notarization, that section was never completed. Chris Youngkin, a forensic scientist with the Texas Department of Public Safety, testified that he analyzed the blood sample taken from Appellant on November 1, 2011. Youngkin explained that the sample contained 0.205 grams of alcohol per 100 milliliters of blood, more than 2.5 times the legal limit.

The grand jury indicted Appellant with the offense of driving while intoxicated, third or more offense. Appellant pleaded "not guilty" to the charged offense, and the case proceeded to trial. At the start of the second day of trial,

---

[2]The TLE-51 form is an outdated form that was previously used to document a mandatory blood draw in accordance with Section 724.012(b)(1) of the Texas Transportation Code. TEX. TRANSP. CODE ANN. § 724.012(b)(1) (West 2011) (applicable to situations where the person arrested for DWI was involved in an accident and the arresting officer reasonably believes that, as a direct result of that accident, another individual has died, has suffered serious bodily injury, or has suffered bodily injury and been transported to a medical facility for treatment).

4

Appellant moved to suppress the results of his blood draw based on Officer Partington's use of the wrong form and Smith's incomplete affidavit. The State argued that the errors in the forms did not negate Officer Partington's statutory authority and duty to obtain a sample of Appellant's blood. The trial court denied Appellant's motion.

## II. *Issues Presented*

Appellant contends in three points of error that the trial court erred (1) when it excused Juror Eva Sauceda, (2) when it denied his motion to suppress evidence related to his blood alcohol level, and (3) when it ordered his life sentence in this case to run consecutively to the life sentence he was on parole for at the time of trial.

## III. *Standard of Review*

We review a trial court's ruling on a motion to suppress under a bifurcated standard of review. *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000). We give great deference to the trial court's determination of the historical facts that are supported by the record. *Guzman v. State*, 955 S.W.2d 85, 87 (Tex. Crim. App. 1997). We also give deference to the trial court's rulings on mixed questions of law and fact when those rulings turn on an evaluation of credibility and demeanor. *Id.* We review de novo the trial court's rulings that do not turn on an evaluation of credibility and demeanor. *Id.*

## IV. *Analysis*

### A. *Excused Juror*

Appellant contends in his first point of error that the trial court erred when it excused Eva Sauceda from the jury. We hold that Appellant waived this issue on appeal because he failed to object to the trial court's decision at the time it was made. *See* TEX. R. APP. P. 33.1(a)(1) (stating that "[a]s a prerequisite to presenting a complaint for appellate review, the record must show that . . . the complaint was

5

made to the trial court by a timely request, objection, or motion"). Even if Appellant had preserved this issue, we would hold that the trial court did not abuse its discretion when it dismissed the juror.

Article 35.03 of the Texas Code of Criminal Procedure provides that the court shall hear and determine excuses offered for not serving as a juror and that, "if the court considers the excuse sufficient," the court shall discharge the prospective juror. TEX. CODE CRIM. PROC. ANN. art. 35.03, § 1 (West 2006). The Court of Criminal Appeals has repeatedly held that a trial court has broad discretion over the process of selecting a jury and may excuse prospective jurors for good reasons. *Jasper v. State*, 61 S.W.3d 413, 423 (Tex. Crim. App. 2001); *Wright v. State*, 28 S.W.3d 526, 533 (Tex. Crim. App. 2000); *Black v. State*, 26 S.W.3d 895, 899 (Tex. Crim. App. 2000). This authority continues even after an individual juror has been sworn and exists until the entire jury is empaneled and sworn. *Wright*, 28 S.W.3d at 533.

After the jury had been selected but before it had been sworn, Sauceda informed the court that, around 7:30 or 8:00 p.m. the night before, a young woman knocked on the front door of Sauceda's home. The woman asked to speak with Sauceda, and after Sauceda arrived at the door, the woman said, "[M]y brother wants me to tell you to make sure you're there tomorrow." The woman identified her brother by name, and Sauceda and her husband realized that the woman was Appellant's sister. Sauceda's husband immediately told the woman that her behavior was illegal and asked her to leave.

When the trial court asked Sauceda if she felt any type of expectation, concern, fear, pressure, or intimidation, the following exchange took place:

> [SAUCEDA]: Yesterday, I was scared. Today, I woke up with a little bit more ease about the situation. But, I mean, I just don't understand how they could, you know, other than him looking over

6

the shoulder get my address and then - - I don't know if he was locked up, but I assume because he came in with the bailiff now. But - - and then relay that to someone that would come to my house. I have two children. That to me is - -

THE COURT: I understand. Ms. Sauceda, we don't want to put you or any juror in this county on any case, whether it's a criminal case, a civil case, a family law matter, in any form of fear or concern or intimidation. Do you think this is the kind of case where it might be best if we excused you from it?

[SAUCEDA]: Maybe so. I mean, I don't mind serving on it if that's what y'all need, but either way, I mean, I don't know.

THE COURT: Do you think it might alleviate some of your fear, frankly?

[SAUCEDA]: Yes, but I would like - - I would hope that it would be investigated, you know, to what he - - or what happened yesterday to someone to get away with - -

THE COURT: No, I assure you that it will be investigated. You mentioned you were scared yesterday in part because you have two children, in part because she came to your house and made contact, and there's a belief that she was related to the defendant in some form or fashion, correct?

[SAUCEDA]: Uh-huh.

THE COURT: And you mentioned you woke up this morning feeling a little bit better, but if you tell me you still possess a concern, if you possess some fear, I'm going to go ahead and excuse you.

[SAUCEDA]: Okay.

THE COURT: You just tell me.

[SAUCEDA]: Yes.

Sauceda clearly expressed some fear or concern to serving as a juror in this case, and the trial court reasonably believed that her apprehension could affect the

7

integrity of the trial. We hold that the trial court acted within its discretion when it released Sauceda from jury service. We overrule Appellant's first point of error.

*B. Compliance with Chapter 724 of the Texas Transportation Code*

Appellant argues in his second point of error that the trial court erred when it denied his motion to suppress evidence of his blood alcohol level. Appellant suggests that Officer Partington's use of the wrong form and the phlebotomist's incomplete affidavit show that the evidence should have been excluded.[3]

Section 724.012(b)(3)(B) of the Texas Transportation Code requires a peace officer to take a blood or breath specimen from a driver arrested for DWI who refuses to consent to the specimen if, "at the time of the arrest, the officer possesses or receives reliable information from a credible source that the person" has, on two or more occasions, been convicted or put on community supervision for DWI. TRANSP. § 724.012(b)(3)(B). Form THP-51, now used to document a mandatory blood draw, allows an officer to specify that he is acting in accordance with Section 724.012(b)(3)(B) of the Texas Transportation Code.

Officer Partington used form TLE-51, which was an earlier version of form THP-51. By signing form TLE-51, Officer Partington agreed to the following statement:

> Acting in my capacity as a peace officer, I have arrested the above-named person for an offense under Chapter 49 of the Texas Penal Code, such person was the operator of a motor vehicle or watercraft, involved in an accident that I reasonably believed occurred as a result of the offense. When I arrested the above-named person, I reasonably believed that a person had died or would die as a result of the accident, and the above-named person has prior to the issuance of this order refused my request to voluntarily give an appropriate specimen or specimens under the authority of Tex. Transp. Code Ann. Ch. 724.

---

[3]We note that Appellant does not challenge the constitutionality of the statute that authorized his blood draw. *See* TRANSP. § 724.012(b)(3)(B).

At trial, Officer Partington admitted that the form's statement was factually incorrect and that he did not read the form before he signed it.

Although Appellant argues that Officer Partington's use of form TLE-51 requires exclusion of any evidence related to his blood alcohol level, he cites no authority for his proposition. We have found no case law that directly addresses Appellant's contention, but we note that Chapter 724 does not require documentation of an officer's decision to order a mandatory blood draw. Section 724.031 requires a defendant who refuses to submit to a blood draw to sign a written statement indicating that the request was made, that warnings were given, and that the defendant refused to provide a blood specimen. Section 724.032 requires the police officer to file an accompanying written refusal report. *See* TRANSP. ch. 724 (West 2011 & Supp. 2014); *see also* TRANSP. §§ 724.031, 724.032.

Officer Partington testified that, at the time of Appellant's arrest, he was aware of Appellant's previous DWI convictions and aware that those convictions authorized a mandatory blood draw.[4] Officer Partington also stated that, upon Appellant's refusal to provide a blood or breath sample,[5] he gave Appellant the warnings contained in Section 724.015. *See* TRANSP. § 724.015. According to Officer Partington, he gave the warnings to Appellant while they were inside the hospital, and after Appellant received the warnings, Appellant voluntarily provided the blood sample.

---

[4]Additional evidence presented at trial confirmed that Appellant has been convicted of the offense of DWI on three prior occasions. Appellant does not challenge the existence of the convictions on appeal.

[5]The State argues that Appellant voluntarily provided a blood sample in this case. The video from Officer Partington's patrol car shows that Appellant originally consented to provide a breath sample but later withdrew that consent and refused to voluntarily provide a breath or blood sample. As of the time that Appellant and the officer exited the car, the blood draw was being referred to as a mandatory blood draw.

We hold that any error caused by Officer Partington's use of the TLE-51 form was cured by the officer's testimony. We also reject Appellant's claim that Smith's affidavit was required to be notarized in order for evidence of his blood alcohol level to be admissible. Appellant has cited no authority for his position, and we have found none. We hold that the affidavit's lack of notarization did not require the exclusion of evidence relating to Appellant's blood alcohol level.

Furthermore, even if we were to hold that the trial court erred in admitting the evidence, which we do not, the State adduced additional evidence that clearly established Appellant's intoxication. A vehicle similar to Appellant's was seen leaving the scene of a hit-and-run accident, and Appellant's vehicle was quickly located in the immediate area. Appellant's vehicle had significant damage that indicated a recent collision, and an open twelve-pack of beer was found inside the vehicle.

At the time of Appellant's arrest, several officers noticed that Appellant smelled strongly of alcohol, that his speech was slurred, and that his balance was unsteady. On the video taken from Officer Partington's patrol vehicle, Appellant admits to drinking five beers, and his speech is clearly slurred. Finally, Appellant showed signs of intoxication on all three standardized field sobriety tests. In light of the overwhelming evidence that Appellant was driving while intoxicated on the night of his arrest, any error in the admission of evidence related to his blood alcohol level did not influence the jury or had but a slight effect and should be disregarded. *See* TEX. R. APP. P. 44.2.

We hold that the trial court did not err when it denied Appellant's motion to suppress evidence of his blood alcohol level given that any errors in the documentation of Appellant's blood draw were cured by the testimony of those involved. We overrule Appellant's second point of error.

*C. Consecutive Sentences*

Appellant argues in his final point of error that the trial court erred when it ordered his life sentence in this case to run consecutively to the life sentence he was on parole for at the time of trial. Appellant claims that the punishment is cruel and unusual because the trial court decided to stack his sentences without any argument or discussion. We find that Appellant has waived this issue on appeal by failing to object to his sentence at the time it was pronounced. *See* TEX. R. APP. P. 33.1(a); *Nicholas v. State*, 56 S.W.3d 760, 768 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd) ("The constitutional right to be free from cruel and unusual punishment may be waived.").

Even if Appellant had preserved error, we would find that his sentence was within the trial court's authority. Stacking otherwise valid and proportionate sentences for separate crimes does not make them disproportionate. CRIM. PROC. art. 42.08(a) (stating that, when the same defendant has been convicted in two or more cases, "in the discretion of the court, the judgment in the second and subsequent convictions may either be that the sentence imposed or suspended shall begin when the judgment and the sentence imposed or suspended in the preceding conviction has ceased to operate, or that the sentence imposed or suspended shall run concurrently with the other case or cases"); *Smith v. State*, 575 S.W.2d 41, 41 (Tex. Crim. App. 1979) ("Normally, the trial judge has absolute discretion to cumulate sentences."). Moreover, the act of cumulating sentences so that they run consecutively has been held not to constitute cruel and unusual punishment. *See, e.g.*, *Stevens v. State*, 667 S.W.2d 534, 538 (Tex. Crim. App. 1984); *Baird v. State*, 455 S.W.2d 259 (Tex. Crim. App. 1970); *Quintana v. State*, 777 S.W.2d 474, 480 (Tex. App.—Corpus Christi 1989, pet. ref'd).

11

We hold that the trial court did not err when it ordered Appellant's life sentence in this case to run consecutively to the life sentence he was on parole for at the time of trial, as the action was within the court's discretion. We also reject Appellant's claim that his punishment is cruel and unusual because the trial court denied him the opportunity to present argument or discussion on the matter. A trial court is not required to explain its decision to impose a sentence that is within the statutory guidelines and is supported by the evidence. Furthermore, Appellant was not entitled to argue against the court's decision after it was announced. And, although he was free to file a motion for new trial urging such a complaint, he failed to do so. We overrule Appellant's final point of error.

V. *This Court's Ruling*

We affirm the judgment of the trial court.

MIKE WILLSON
JUSTICE

October 9, 2014

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Wright, C.J.,
Willson, J., and Bailey, J.